UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| RHONDA R. WALLACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:18-CV-181-HBG |
| | ) | |
| ROANE COUNTY EMS-AMBULANCE | ) | |
| SERVICE, an agency of ROANE COUNTY, | ) | |
| TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal

Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry

of judgment [Doc. 15].

Now before the Court is Defendant's Motion for Summary [Doc. 27].  Plaintiff filed a

Response [Doc. 45] in opposition to the Motion, and Defendant filed a Reply [Doc. 47].  The Court

also granted the parties leave to file supplemental briefs [Docs. 51, 52].  The Motion is now ripe

for adjudication.   Accordingly, for the reasons further explained below, the Court finds

Defendant's Motion [**Doc. 27**] well taken, and it is **GRANTED**.

I.      **BACKGROUND**

The Complaint in the instant matter alleges that Defendant discriminated against Plaintiff

based on her sex, and therefore, violated Title VII.   The following facts are taken from the parties'

briefs, unless otherwise noted.[1]

---

[1] In Plaintiff's Response, she asserts that she does not oppose Defendant's Motion with
respect to her Equal Pay Act/Title II pay discrimination claims.  [Doc. 45 at 2].  Thus, the Court
will not summarize any facts that pertain to these claims.

Plaintiff began working for Defendant again in 2013 as a part-time paramedic.  [Doc. 27-2 at 3].[2]  Plaintiff became a full-time paramedic for Defendant in May 2014.  [*Id.* at 7].  In October 2014, Tim Suter ("Director Suter") became the Ambulance Director.  [Doc. 27-4 at 2].  During the relevant time period, paramedics and EMTs rotated their schedules, working a 24-hour shift and then taking 48 hours off before working the next shift.  [*Id.* at 3].  There are four ambulance trucks, which are referred to as Medics 1, 2, 3, and 4, and each ambulance truck is staffed with a paramedic and an EMT.  [*Id.*].  Pursuant to a Roane County ordinance, Defendant is required, at a minimum, to maintain on all emergency responses a paramedic and an EMT.  [*Id.*].  EMTs and paramedics report to the shift captain.  [*Id.* at 4].  The four ambulance trucks are stationed at different locations.  [*Id.*].

On January 23, 2016, Plaintiff wrote a grievance about an incident with an EMT, Michael Danner.  [Doc. 45-9].  The grievance stated that on January 21, 2016, Danner asked Plaintiff why she was complaining to the shift captain about "them" not cleaning the building.  [*Id.*].  Plaintiff told Danner that she was supposed to report to the shift captain.  [*Id.*].  Danner jumped up from the couch, flipped it over, and began yelling at Plaintiff.  [*Id.*].  Plaintiff wrote that she felt threatened and scared by Danner's behavior.  [*Id.*].  As a result of the grievance, Plaintiff testified that she met with Director Suter.  [Doc. 27-2 at 21].[3]  Plaintiff testified that Director Suter stated, "I don't want you around Danner, don't work with him, don't look his way, don't have no contact with him whatsoever; and if this happens again, you get in your car and you leave."  [*Id.*].  Director Suter testified as follows:

---

[2] Plaintiff had previously worked for Defendant as an EMT.  [Doc. 27-2 at 3].

[3] During Director Suter's deposition, he testified that he had never seen Plaintiff's written grievance.  [Doc. 45-5 at 35].  Plaintiff testified that she emailed the written grievance to her shift caption, Scott Thomas.  [Doc. 45-1 at ¶ 3].

Okay. She had a personality conflict with Mike Danner. They didn't get along; I knew that. So the way our shifts are set up, if you and I are scheduled on an ambulance as regular full-time partners, every third day you and I show up at the same place, work for 24 hours together, and then go home. That's your regular partner.

Now, if you and I are partners and you call in sick, I may be assigned a different person to work with for that day for that 24-hour period. When all of –all of the stuff happened between Ms. Wallace and Mr. Danner, I told both of them, I will not assign you as regular partners meaning I won't assign you to the same shift where you work for 24 hours together every third day for an extended period of time. But I made the stipulation. There may be an occasion when you are asked to run calls together. Is that ok? And they both had told me, I can do that. We're professionals.

[Doc. 45-5 at 33-34].

On December 5, 2016, Plaintiff was at Station House 4 to begin her shift, which began at 6:45 a.m. [Doc. 27-4 at 5]. Paramedic Jarred Barnett and EMT Danner were also at Station House 4, and their shift ended at 7:00 a.m. [*Id.* at 6-7].[4] Plaintiff was to relieve paramedic Barnett from his shift, and EMT Pat Murphy was supposed to relieve EMT Danner from his shift. [*Id.*]. Director Suter explained that once a relief shows up, the other person may leave after the "swap." [*Id.* at 5]. He explained that prior to leaving, the paramedic gives the oncoming paramedic the narcotic keys, reports whether there are any mechanical issues, road closures, and any other information that is pertinent. [*Id.*].

At approximately 7:00 a.m., a call came in regarding a patient having a seizure. [Doc. 45-12]. Plaintiff's EMT partner, Murphy, had not arrived when the call came in. [Doc. 45-3 at 11]. When the call came in, Plaintiff was with paramedic Barnett signing over the narcotics. [*Id.* at 15]. Plaintiff claims that she was prohibited from making any runs until that process is complete

_____

[4] Director Suter testified that there is an overlap between the employees who are about to finish with their shift and the employees who are about to start their shift. [Doc. 27-5 at 5].

and that Barnett was still on duty when the call came in.  [Doc. 45-1 at ¶ 7].  Director Suter explained that Barnett was relieved by Plaintiff.  [Doc. 27-4 at 9].  Director Suter explained, "At that point[,] the paramedic has made their transition.  Mr. Barnett was not obligated to stay there – nor was he obligated to run any more calls for the shift."  [*Id.* at 10].

In any event, according to Plaintiff's deposition testimony, she told Barnett that he would have to be dispatched, but Barnett stated that he could not go because his mother-in-law was having surgery.  [Doc. 45-3 at 15].  Barnett said that he would call the shift captain, John Fisher.  [*Id.*].  Barnett told Plaintiff that Fisher would take care of it.  [*Id.* at 15-16].  Plaintiff assumed Fisher took the call as the paramedic.  [*Id.* at 16-17].

Plaintiff stated that she became concerned because she did not hear Medic 1 respond to the call.  [*Id.* at 18].  Plaintiff testified that she called Fisher, who told her to "suck it up and run the call."  [*Id.*].  Plaintiff replied, "Fish, you know that I can't run that call with Danner," and she requested that Barnett go with her.  [*Id.* at 18-19].  Plaintiff further testified that Barnett could not go because his mother-in-law was having surgery.  [*Id.* at 19].  Plaintiff testified, "I refused to run the call with Danner, yes.  I would run the call with anybody else."  [*Id.*].  Ultimately, Fisher ran the call.  [*Id.*].

Later that morning, Fisher texted Plaintiff to go home and he was sending a truck to Station 4 to relieve her.  [*Id.* at 20].  Plaintiff responded that she did not refuse to run the call; she refused to run the call with Danner.  [*Id.*].  She also told Fisher that he did not have the authority to send her home.  [*Id.*].  Plaintiff then got into an ambulance truck to take it to Station 1.  [*Id.*].  Plaintiff claims that it is standard practice for the oncoming crew to take the ambulance truck to the main station to turn over the paperwork for the crew that had just been relieved and to get supplies.  [Doc. 45-1 at ¶ 8].  Plaintiff testified during her deposition that she took the ambulance truck to

get supplies and to talk to Director Suter. [Doc. 45-3 at 21]. Fisher directed Plaintiff to take the ambulance truck back to Station 4 because another paramedic was coming in to relieve Plaintiff. [*Id.*]. Plaintiff took the truck back to Station 4 and later returned to Station 1 to discuss the matter with Director Suter. [*Id.*].

Prior to Plaintiff discussing the matter with Director Suter, Fisher called Director Suter at approximately 8:13 a.m. [Doc. 27-4 at 18]. Fisher told Director Suter what had occurred with Plaintiff. [*Id.*]. Specifically, Fisher reported that Plaintiff said that she did not have a partner to run the call. [*Id.* at 10]. Fisher told Director Suter that he instructed Plaintiff to run the call with Danner, and Plaintiff refused to run the call. [*Id.*]. After the telephone call with Fisher, Director Suter discussed the matter with Mayor Woody prior to a staff meeting. [*Id.* at 18]. Director Suter testified that he and Mayor Woody are the only people who have the ability to terminate an employee. [*Id.*]. Director Suter testified that while field captains cannot terminate an employee, they are permitted to send employees home. [*Id.*]. Director Suter stated that Mayor Woody agreed that Plaintiff's actions were a terminable offense. [*Id.*].

After the staff meeting, Director Suter went back to his office at Station 1. [*Id.* at 19]. Fisher was already there and again told Director Suter what had occurred. [*Id.*]. Director Suter stated that Plaintiff also walked into his office and began "defending herself." [*Id.*]. Director Suter stated that he had not decided to terminate Plaintiff until he had heard her version of the events. [*Id.* at 20].

Plaintiff testified that when she arrived at Station 1, she met with Director Suter and explained that she did not refuse to take the call, but instead, she refused to run the call with Danner because Director Suter previously told her not to work with Danner. [Doc. 45-3 at 21-22]. Plaintiff further testified that Director Suter stated, "Well, we're all grownups here" and asked where

Danner was during the incident. [*Id.* at 22]. Plaintiff stated that Danner was asleep and that she was not his keeper and was not going to wake him up. [*Id.*]. Director Suter told Plaintiff that her services were no longer needed and that she would be lucky if she did not lose her license over the incident. [*Id.*].

Fisher wrote an incident report that is dated December 5, 2016, and largely comports with the above facts. [Doc. 45-10]. Specifically, in his incident report, Fisher stated that Barnett called him to report that Medic 4 had received an emergency call but Plaintiff's partner had not arrived yet. [*Id.*]. Fisher reported that Barnett was leaving because a family member was having surgery and Barnett was off duty. [*Id.*]. Fisher asked if Danner was there, and Barnett responded that Danner was still there. [*Id.*] Fisher told Barnett to send Plaintiff and Danner on the call. [*Id.*]. Fisher stated that within a minute, Plaintiff called him, stating, "Hey Fish, can you get another unit to run this call? I don't have a partner?" [*Id.*]. Plaintiff stated that she could not work with Danner, and Fisher responded, "Rhonda, right now I am getting supplies for the units and Medic 3 just got back. That call is far away from our area and close to you, please take it." [*Id.*]. Plaintiff refused to take the call with Danner, and Fisher stated, "Rhonda, can you not suck it up for one call and work with Danner?" [*Id.*]. Plaintiff told Fisher to find someone else, so Fisher took the call. [*Id.*]. After arriving to the hospital, Fisher texted Plaintiff that he was relieving her from duty because she refused to take an emergency call in the area. [*Id.*]. Plaintiff responded that she did not refuse to take a call and that Fisher did not have the authority to send her home. [*Id.*].

Further, the incident report states that Fisher called the Medic 3 crew and ordered them to go to the Medic 4 station. [*Id.*]. Fisher then heard Plaintiff on the dispatch stating that she was "en route to midtown." [*Id.*]. Fisher told Medic 3 to stand down because Medic 4 was heading to midtown and not complying with orders. [*Id.*]. Fisher saw Plaintiff at the front of the ambulance

station, and Plaintiff advised him that he did not have the authority to send her home and that she wanted to meet with Director Suter. [*Id.*]. Fisher ordered her to take her ambulance truck back to Medic 4 station and advised her that she could return in her personal vehicle. [*Id.*]. Plaintiff stated, "No, since we are out of service[,] we will just sit here." [*Id.*]. Fisher ordered EMT Murphy to take the truck back to Medic 4 station, and EMT Murphy complied. [*Id.*].

Finally, Director Suter completed a Separation Notice [Doc. 27-1 at 1] on December 9, 2016, explaining that "during paramedic Wallace's shift, dispatch assigned her ambulance to an emergency call. Paramedic Wallace refused to respond." [*Id.*].

## II. POSITIONS OF THE PARTIES

Defendant moves [Doc. 27] for summary judgment arguing that there are no genuine issues of material fact. Defendant argues that Plaintiff was an at-will employee who was terminated because she refused to run a call for a patient that was having a seizure. Defendant states that Plaintiff was not treated any differently than similarly-situated male employees concerning her termination. Defendant states that Plaintiff cannot establish a prima facie case and that it has shown a legitimate non-discriminatory reason for Plaintiff's termination. Defendant states that Plaintiff cannot establish that its legitimate non-discriminatory reason is pretexual.

Plaintiff responds [Doc. 45] that Defendant is unable to carry its burden of showing that there are no genuine issues of material fact. Plaintiff asserts that males have refused to run calls, citing to an affidavit by Barry Cochran, Defendant's former employee. Plaintiff states that according to Cochran, ambulance calls are re-routed for personal reasons by certain male shift captains. In addition, Plaintiff points to another situation, wherein an employee refused to work mandatory overtime. Plaintiff argues that these additional facts show that Defendant's articulated reason for its action in terminating her employment is pretext for discrimination.

Defendant replies [Doc. 47] that Cochran's affidavit should not be considered by the Court. Defendant states that the affidavit is simply a sham affidavit to avoid summary judgment. Defendant argues that throughout discovery, it asked Plaintiff how it discriminated against her, and she responded that she was terminated when others were not. Defendant argues that Plaintiff never mentioned the alleged similarly-situated employees as set forth in Cochran's affidavit. Defendant states that even if the Court were to consider the affidavit, the proof supports that Plaintiff was not terminated under circumstances suggesting a discriminatory motive because she was not treated differently from similarly-situated employees. Defendant maintains that Plaintiff was terminated for refusing to run a call and that it has established that the reason for her termination was not pretexual. In support of its position, Defendant offers a Second Declaration of Director Suter.

As mentioned above, the Court allowed the parties to file supplemental briefs. In Plaintiff's Sur-Reply [Doc. 51], she denies submitting a sham affidavit and argues that the cases Defendant cites are not applicable. Plaintiff argues that she disclosed Cochran in her Rule 26(a) initial disclosures. Plaintiff states that Defendant did not conduct any written discovery in this case and that if it wanted to learn more information, it could have propounded discovery requests. Further, Plaintiff disagrees with the statements in Director Suter's Second Declaration, and she submits another affidavit from Cochran.

Defendant filed a Response [Doc. 52] to Plaintiff's Sur-reply, arguing that Cochran's affidavits should not be considered because they provide information that is contradictory to Plaintiff's testimony and Plaintiff failed to properly provide discoverable information as required under the Federal Rules of Civil Procedure. Defendant argues that any alleged mistreatment toward Plaintiff as a shift captain is not an issue, but rather, the only claim at issue is whether she

was terminated from her position as a paramedic due to her sex.  Defendant argues that even if the Court considers Cochran's affidavits, they do not create genuine issues of material fact that refute Defendant is entitled to summary judgment. [5]

## III.    STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing that no genuine issues of material fact exist.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993).  All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317).  To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law.  *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the finder of

_____

[5] The Court notes that it has also reviewed Plaintiff's Supplemental Brief [Doc. 69], filed on August 7, 2019.  The Supplemental Brief does not change the Court's analysis herein.

fact. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

## IV.    ANALYSIS

The Court has reviewed the parties' positions as outlined above, and for the reasons further explained below, the Court finds Defendant's Motion [**Doc. 27**] well taken, and it is **GRANTED**.

As an initial matter, the Court notes that Defendant argues that it is entitled to summary judgment as to any Title VII or EPA claim related to pay because such claims are barred by the statute of limitations and Plaintiff did not receive disparate pay to similarly-situated male employees. In Response, Plaintiff states that "she does not oppose summary judgment on those particular claims." [Doc. 45 at 2]. Accordingly, based on Plaintiff's representation, the Court will **GRANT** summary judgment in Defendant's favor on Plaintiff's Title VII/EPA claims that are related to pay.

Further, before turning to the merits of Plaintiff's Title VII claim, the Court notes that Defendant objects to Cochran's affidavits. The Court will first address Defendant's objections to Cochran's affidavits and then turn to Defendant's argument with respect to Plaintiff's sex discrimination claim.

## A. Cochran's Affidavits

Cochran submitted two affidavits, [Doc. 45-2] ("First Affidavit") and [Doc. 51-1] ("Second Affidavit"), in this case. In his First Affidavit, in relevant part, he states:

> 3. Throughout my employment, it was a common practice and occurrence for 911/emergency ambulance calls to be re-routed for personal reasons to other medic units by certain male shift captains with whom I worked. This included the entire time that Tim Suter was the Director. Based on my personal observations, this occurred with shift captains Steve Renzo and John Fisher, both of whom were partners of mine at some time or another, who would refuse to run 911 calls of all priorities that were dispatched by instructing the dispatcher to re-route the call to another unit. I have no knowledge of a female shift captain doing so.

> 4. These occurrences of these male shift captains re-routing 911 calls were well-known. Every station, including Station 1, has a radio where ALL transmissions between an ambulance and dispatch, as well as between ambulances, are played. Mr. Suter carried a portable radio on his hip. Regardless of which station Mr. Suter was in, or if he was even at home or in his vehicle, it would be literally impossible for him to have never heard a shift captain re-route a 911 call.

> 5. There were no instructions, policies, or notices given to any of us that calls were not to be re-routed, let alone for personal reasons. I have also never heard of any employee being disciplined for refusing to take a call regardless of their reason until Rhonda Wallace shared her story with me.

[Doc. 45-2 at ¶¶ 3-5].

Defendant argues that Cochran's affidavit should not be considered by the Court. In support of this request, Defendant states, "Plaintiff has made an ill-disguised attempt to create a sham issue of fact to avoid summary judgment through the affidavit of Barry Cochran." [Doc. 47 at 2]. Defendant argues that during Plaintiff's deposition, she stated that Cochran would testify to how she was mistreated as a shift captain because she is a woman. Plaintiff further testified that she was treated differently because she was terminated and "they" were not. When asked to

identify "they," Plaintiff testified that Danner was not terminated. Defendant argues that Plaintiff never mentioned Steve Renzo, John Fisher, and Chris McNeal as similarly-situated employees. Defendant asserts that Cochran's affidavit directly concerns the disputed issues in this case and that based on Plaintiff's deposition and initial disclosures, Defendant could not have anticipated that Cochran would be offering such testimony. Defendant offered a Second Declaration of Director Suter to rebut Cochran's statements.

In response, Plaintiff provided Cochran's Second Affidavit to rebut Director Suter's statements in his Second Declaration. In Cochran's Second Affidavit, he states that "shift captains contacted dispatch with instructions to re-route the call to another ambulance because they simply did not want to take a call themselves." [Doc. 51-1 at ¶ 3]. Cochran states, "I have been with Steven Renzo and John Fisher when they would refuse to run 911 calls of all priorities by instructing the dispatcher to re-route the call to another unit. None of those instances involved dispatch contacting the shift captain to determine which ambulance would be sent." [*Id.*]. Further, Cochran states, "In other words, it became routine practice that the 'priority' of an emergency call came secondary to the personal preference of shift captains Renzo and Fisher." [*Id.* at ¶ 4]. In response to Cochran's Second Affidavit, Defendant requests that the Court not consider his statements because Plaintiff never disclosed such information until now.

As mentioned above, Defendant claims that Cochran's affidavits create a sham issue of fact, citing the Sixth Circuit's decision in *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006). In *Aerel*, the Sixth Circuit noted that a "party cannot create a disputed issue of material fact by filing an affidavit that contradicts the party's earlier deposition testimony." *Id.* (citing *Penny v. United Parcel Service,* 128 F.3d 408, 415 (6th Cir. 1997)) ("[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment

has been made, that essentially contradicts his earlier deposition testimony."). The Sixth Circuit stated that the above rule does not, however, prevent "a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit. Such an affidavit fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage. *Id.* at 907.

The Court notes that the present situation is different than the circumstances presented in *Aerel* because Plaintiff is not relying on her own affidavit to contradict her deposition testimony. The Court further notes that the other cases that Defendant relies on also relate to whether a party may submit his/her affidavit that contradicts his/her previous deposition testimony. *Rayfield v. Am. Reliable Ins. Co.*, 641 F. App'x 533, 540 (6th Cir. 2016) (Stranch J., concurring) (discussing that a "directly contradictory affidavit should be stricken . . . unless the party provides persuasive justification of the contradiction) (citing *Aerel*, 448 F.3d at 908); *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012) (finding that the district court correctly disregarded plaintiff's assertion because it came from a post-deposition declaration that contradicted her earlier deposition testimony).

Specifically, here, Cochran was identified in Plaintiff's initial disclosures as a general witness and Plaintiff's partner. During Plaintiff's deposition, the following exchange occurred:

> Q. Okay. Is there anything he's going to testify to that I need to know about? And the question is [if] he's got a list of people likely to have discoverable information that the plaintiff my use to support her claims. Now are these –are those two people just saying what a great paramedic you are or are they going to say, that had it in for women, you know.
>
> A. I think they will testify on how I was mistreated as a shift captain 'cause I was a woman.

Later, during her deposition, when asked how she was treated differently than other male employees, she explains that Danner was not terminated. She does not mention other similarly-situated male employees. Defendant argues that Plaintiff had a duty to supplement her initial disclosures. The Court agrees that under Rule 26(e), a party is required to supplement initial disclosures. No party, however, has analyzed Plaintiff's alleged deficiencies under Rule 37(c)(1), and therefore, the Court will consider Cochran's affidavits. In any event, however, and as further explained below, the Court finds that Cochran's affidavits do not create a genuine issue of material fact and that Defendant is entitled to summary judgment.

**B.**     **Discrimination Claim**

Title VII of the Civil Rights Act of 1964 prohibits discrimination based on sex with regard to an employee's compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1). In establishing a discrimination claim under Title VII, a plaintiff may show the discriminatory intent of his/her employer through either direct or circumstantial evidence. *Golden v. Mirabile Inv. Corp.*, 724 F. App'x 441, 446 (6th Cir. 2018). Here, Plaintiff bases her claim on circumstantial evidence.

Title VII claims proceeding on circumstantial evidence are analyzed under a burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "The burden is first on the plaintiff to demonstrate a prima facie case of [ ] discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext—i.e., that the employer's explanation was fabricated to conceal an illegal motive." *Golden,* 724 F. App'x at 446 (other quotations omitted). In order to demonstrate a prima facie case, a plaintiff must show that:

> (1) he or she was a member of a protected class; (2) he or she
> suffered an adverse employment action; (3) he or she was

qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.

*Id.* at 447 (other quotations omitted). "For a sex discrimination claim, the fourth factor is limited to the plaintiff being treated differently than similarly-situated employees [of the opposite gender]." *Id.* (other quotations omitted).

The parties agree that Plaintiff has established the first three elements. The parties dispute, however, whether Plaintiff was treated differently than similarly-situated male employees. "[T]o be considered 'similarly-situated' . . ., the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Mann v. Navicor Grp., LLC*, 488 F. App'x 994, 999 (6th Cir. 2012) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998)) (other quotations omitted). This includes the alleged misconduct. *Crawford v. Chipotle Mexican Grill, Inc.*, No. 18-3360, 2019 WL 2273407, at *8 (6th Cir. May 28, 2019) (citing *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 621, 654 (6th Cir. 2012)). "True, the plaintiff's and comparator's actions need not be identical . . . but the 'conduct must be similar in kind and severity.'" *Id.* (quoting *Bobo v. United Parcel Serv. Inc.*, 665 F.3d 741, 751 (6th Cir. 2012)).

In support of her argument that similarly-situated employees were treated more favorably, Plaintiff states that shift captains refused to run calls and that another male employee refused to work an overtime shift. With respect to the male employee who refused to work an overtime shift, the Court agrees with Defendant that the situation is not comparable to Plaintiff's actions. There, an EMT was advised that he had to work mandatory overtime. [Doc. 45-13]. The EMT asked another employee to cover his shift, and the employee agreed. [*Id.*]. Afterwards, an employee became sick and could not work. [*Id.*]. The EMT advised Plaintiff that he was not staying for his

mandatory overtime because he was able to get someone to cover his shift. [*Id.*]. The EMT refused to work the next shift and went home. [*Id.*]. Director Suter gave the EMT a final written warning, which stated, "Precedence has been set that this to be [sic] a terminable offense[;] however, [due] to the review and revision of the policy[,] it was determined that the Final Written Warning would be issued." [*Id.*]. Director Suter explained, "I gave Mr. McNeal a written warning for his poor handling of the situation, but ultimately thought that since McNeal had indeed found someone to cover from him, the responsibility should have moved to the next person that was up for mandatory at that time." [Doc. 47-1 at ¶ 5]. Here, Plaintiff was already working her shift when she refused to run a call for a person having a seizure. The Court finds that refusing to work a shift is fundamentally different than refusing to run a call during an emergency. The Court finds that Plaintiff's alleged misconduct is not similar in kind and severity to the EMT's misconduct.

In addition, Plaintiff relies on Cochran's affidavits, which claim that shift captains refused to run 911 calls of all priorities by instructing the dispatcher to re-route the call to other units. The parties dispute whether shift captains re-routed calls as part of their duties or whether they refused calls because they did not want to take the call. At first glance, the alleged misconduct seems similar to Plaintiff's conduct for which she was terminated. After reviewing the affidavits, however, the Court finds that Plaintiff has not established that shift captains are comparable employees with respect to her own position, which at the time of the incident, was a non-supervisory position. The Sixth Circuit has explained that there are three factors that are relevant in determining whether employees are "similarly situated" in context of cases alleging differential disciplinary action:

> the individuals with whom the plaintiff seeks to compare his/her treatment must have [1] dealt with the same supervisor, [2] have been subject to the same standards and [3] have engaged in the same conduct without such differentiating or mitigating circumstances

> that would distinguish their conduct or the employer's treatment of
> them for it.

*Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016) (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577 (6th Cir. 1992)); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (explaining the relevancy of the *Mitchell* factors).

Plaintiff does not dispute that shift captains have additional responsibilities than paramedics. *See* [Doc. 27-2 at 10] (Plaintiff testifying that shift captains have added responsibilities). To be clear, Plaintiff is not required "to demonstrate an exact correlation with the employee receiving more favorable treatment." *Ercegobich*, 154 F.3d at 352. The problem that Plaintiff faces is that she does not provide any evidence to support that shift captains are comparable employees. In addition, the Court agrees with Defendant that Plaintiff does not provide any examples of Steve Renzo and John Fisher's misconduct that would lead the Court to conclude that their conduct was similar to Plaintiff's conduct. Cochran's second Affidavit asserts that Steve Renzo and John Fisher refused to "run 911 calls of all priorities by instructing the dispatcher to re-route the call to another unit." [Doc. 51-1]. Even if true, Plaintiff's conduct is different in kind and severity from the general allegation that shift captains refused to take calls because Plaintiff's shift captain directly instructed her to run the call, and she refused. Furthermore, the Court agrees with Defendant that Cochran's affidavits do not establish that Director Suter was aware of shift captains refusing calls. Cochran states that it "would be literally impossible for him to have never heard a shift captain re-route a 911 call." [Doc. 45-2]. The Court does not equate this statement to mean that Director Suter had knowledge of shift captains refusing to take calls for personal reasons. Accordingly, the Court finds that Plaintiff has not established a prima facie case.

Even if Plaintiff were able to establish a prima facie case, the Court finds that Defendant has offered a legitimate, nondiscriminatory reason for terminating Plaintiff's employment, which Plaintiff has not sufficiently rebutted. Defendant terminated Plaintiff for refusing to respond to an emergency call when her shift captain directly instructed her to take the call. The burden then shifts back to Plaintiff to show that Defendant's articulated reason for terminating her was pretext for discrimination, meaning that it: (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 549 (6th Cir. 2006). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Alberty v. Columbus Twp.*, 730 F. App'x 352, 361 (6th Cir. 2018) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)) (other quotations omitted).

Plaintiff raises a number of arguments in an attempt to demonstrate pretext. For instance, Plaintiff states that she has established that she was not permitted to work with Danner. In addition, Plaintiff states that prior to her termination, Director Suter changed the policy regarding where crew changes occurred. Plaintiff argues that had the old policy been in place, she would have been at Station 1, and this episode would not have happened. Plaintiff further argues that the entire incident actually saved time and that no one "bothered to even look into whether there would have been any consequences." [Doc. 45 at 13]. She further asserts that it was unfortunate that Barnett's mother was having surgery, but Fisher could have directed Barnett to take the call because he was not off the clock as others have testified. Finally, she asserts that, contrary to Fisher's report, she drove the ambulance back to Medic 1 because it is standard procedure. It is not the Court's role

to determine whether Defendant made the correct decision in terminating her. The issue is whether Plaintiff's action (i.e., refusing to run a call, contrary to her shift captain's instruction) was the basis for Defendant's decision to terminate Plaintiff, or whether the decision to terminate Plaintiff was merely a pretext for gender discrimination. The Court finds that the decision to terminate was not a pretext for discrimination.

## V.     CONCLUSION

Accordingly, for the reasons explained above, the Court finds Defendant's Motion for Summary Judgment [**Doc. 27**] well taken, and it will be **GRANTED**. A separate judgment will enter **DISMISSING** this case.

ORDER ACCORDINGLY.

_____
United States Magistrate Judge